# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| ASHOK MAYYA,<br><br>Plaintiff,<br><br>v.<br><br>EDWARD LEE, MATTHEW DURGIN, JAEWOO HWANG, RONALD WASINGER, ADAM SEXTON, CHRIS JO, BYEONG HEON YOO, DAMON PARK, YONG SUNG PARK, ZENITH ELECTRONICS, LLC, LG ELECTRONICS, INC.,<br><br>Defendants,<br><br>and<br><br>ALPHONSO INC.,<br><br>Nominal Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )    C.A. No. 2023-0382-NAC |

## MEMORANDUM OPINION

Date Submitted: June 17, 2026
Date Decided: July 27, 2026

Bradley R. Aronstam, R. Garrett Rice, & Holly E. Newell, Ross Aronstam & Mortiz LLP, Wilmington, Delaware; Brian M. Burnovski, Nikolaus J. Williams, Allison Siesser & Zachary A. Zaremba, Davis Polk & Wardwell LLP, New York, New York; *Counsel for Plaintiff.*

William M. Lafferty, Ryan D. Stottmann, Lauren K. Neal, Alec F. Hoeschel, & Phillip Reytan, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware; *Counsel for Defendants.*

Atif Khawaja, Haley S. Stern, & Mike Rusie, Kirkland & Ellis LLP, New York, New York; *Counsel for Defendants LG Electronics, Inc. and Zenith Electronics LLC.*

Eric Leon & Nathan Taylor, Latham & Watkins LLP, New York, New York; *Counsel for Defendants Edward Lee, Matthew Durgin, Jaewoo Hwang, Ronald Wasinger, Adam Sexton, Chris Jo, Byeong Heon Yoo, Damon Park, and Yong Sung Park.*

**Cook, V.C.**

In 2020, a major electronics company acquired a controlling stake in a tech startup in the digital advertising space. As part of that investment, the startup's now-minority stockholders secured certain rights regarding the company's management and their ability to sell their stock. The parties effectuated the investment via a series of contracts with broad arbitration provisions. Since then, the minority stockholders have clashed with the new controller and its affiliated directors regarding the startup's management, and the bargained-for liquidity rights.

That dispute led to this action, which (1) seeks to determine the validity of a written consent removing directors and (2) asserts various derivative breach of fiduciary duty claims. Having resolved the dispute over the written consent, the next step is to consider the fiduciary duty claims. Before addressing the merits, the Court must determine where those fiduciary duty claims should be heard. Defendants seek to arbitrate Plaintiff's claims under the initial investment agreements. Yet, the Court concludes that, because 8 *Del. C.* § 122(18) was enacted after this action commenced and thus does not apply, the corporation lacked authority to agree in advance to litigate the plaintiff's fiduciary duty claims exclusively outside of Delaware. Namely, under the law applicable to this case, the startup could not agree via contract to route Mayya's fiduciary duty claims to arbitration. Thus, Defendants' motion to compel arbitration is denied. Separately, the Court concludes that Plaintiff made a *prima facie* showing that the investing company implicitly consented to the Court's personal jurisdiction in this case.

2

## I.  BACKGROUND

### A. Factual Background

Nominal Defendant Alphonso Inc. ("Alphonso") provides technology for smart TVs to help advertisers reach consumers and measure the impact of their ad campaigns.[1]  Alphonso's charter has a forum selection clause ("Charter Forum Selection Clause") that reads in part:

> Unless [Alphonso] consents in writing to the selection of an alternative forum, the Court of Chancery in the State of Delaware shall be the sole and exclusive forum for any stockholder . . . to bring (i) any derivative action . . . on behalf of [Alphonso], (ii) any action asserting a claim of breach of fiduciary duty owed by any director [or] officer . . . to [Alphonso] or [Alphonso's] stockholders, . . . or (iv) any action asserting a claim against [Alphonso], its directors [or] officers [] [] governed by the internal affairs doctrine[.][2]

Plaintiff Ashok Mayya has been an Alphonso stockholder since 2013 and beneficially owns 21,563 shares of its common stock.[3]

Defendant Zenith Electronics, LLC ("Zenith") is a Delaware limited liability company, wholly owned by non-party LG Electronics U.S.A., Inc. ("LG US"), which is an indirect, wholly owned subsidiary of Defendant LG Electronics, Inc. ("LGE").[4] Zenith owns 59.5% of Alphonso's common stock on a fully diluted basis and is the company's controlling stockholder.[5]  As alleged, "all decisions related to Alphonso are

---

[1] Dkt. 347 ("SAC") ¶ 36.  Citations to "Dkt. ____" refer to the docket in this matter.

[2] Dkt. 280 ("MTC Opening Br."), Ex. B ("Alphonso Charter") Art. XII.

[3] SAC ¶ 11. That figure includes stock held by Mayya Consulting LLC, an entity controlled by Mayya and his wife. *Id.*

[4] *Id.* ¶¶ 16-17.  LGE is a major electronics and TV manufacturer. *Id.* ¶ 37.

[5] *Id.* ¶ 16.

controlled by executives at LGE, which is Alphonso's ultimate controller." [6] Defendants Chris Jo, Edward Lee, Jaewoo Hwang, Ronald Wasinger, Matthew Durgin, Damon Park, Byeong Heon Yoo, and Yong Sung Park (collectively, "Director Defendants") served as Zenith-appointed members of Alphonso's board of directors ("Board"). [7] Defendant Adam Sexton was Alphonso's interim CEO from late 2022 to early 2023. [8]

In 2020, LGE sought to revitalize its struggling internal "connected TV advertising technology" business by acquiring a controlling stake in Alphonso through Zenith ("Investment"). [9] Zenith purchased the stock needed to secure control over Alphonso from (1) Alphonso itself, (2) Alphonso executives, and (3) Alphonso's Series A investors. [10] Zenith effectuated its purchase of stock from Alphonso's Series

---

[6] *Id.* ¶¶ 16-17 ("LGE and its senior leadership team . . . make and have made all material decisions for, and exercise and have exercised control over, Zenith in respect of its controlling equity stake in Alphonso. Zenith acts as LGE's agent with respect to all matters relating to Alphonso. As a result, LGE is the ultimate controlling stockholder of Alphonso.").

[7] *Id.* ¶¶ 18-25. In addition to serving on the Board, the Director Defendants held various executive roles at LGE, LG US, and Alphonso. *Id.* ¶¶ 18 (Jo "was a senior vice president at LGE and was head of the Platform business in LGE's Home Entertainment division . . . which is responsible for overseeing Alphonso."), 19 ("Lee was [] a Senior Director for LG webOS Ad Business Development at LGE."), 20 ("Hwang was [] the Executive Director and CFO at LG US."), 21 ("Wasinger was the Vice President and General Counsel at LG US."), 22 ("Durgin was the Senior Director for North American Smart TV Partnerships at LG US."), 23 (Damon "Park has [] served as the Global Manager for Global Advertisement Business and LG Channels at LGE."), 24 ("Yoo also served as Executive Director and CFO at LG US."), 25 (Yong Sung "Park also served at Legal Counsel at LGE and Alphonso.").

[8] *Id.* ¶¶ 72-74, 79-80.

[9] *Id.* ¶ 37.

[10] Dkt. 362 ("Supp. Opening Br."), Exs. A-C.

4

A investors in a Series A Agreement.[11] The Series A Agreement contains an arbitration clause ("Series A Arbitration Clause") that reads, in part:

> Any controversy, claim or question of interpretation in dispute between [Zenith], on one hand, and any Seller or [Alphonso] on the other hand . . . arising out of or relating to this Agreement, any document contemplated by this Agreement or the transactions contemplated herein (including as to arbitrability hereunder), shall be settled by final and binding arbitration in New York, New York under the then-effective rules of the International Chamber of Commerce ("ICC")[.][12]

As part of the Investment, "LGE oversaw the amendment of Alphonso's charter," ("Charter Amendment").[13] LGE proposed and drafted the Charter Amendment, which did not alter the Charter Forum Selection Clause.[14] Alphonso's adoption of the Charter Amendment was a condition to LGE's Investment.[15]

As an Alphonso Series A investor, Mayya was invited to sell stock to Zenith as part of the Investment.[16] On December 3, 2020, the Series A holders received an email disclosing that "LG Electronics . . . through its subsidiary, Zenith . . . will acquire a majority of the shares of Alphonso."[17] That email stated that "[a]n element of that transaction is the opportunity for each Series A holder to sell 100% of their shares to Zenith."[18] The email also provided the "high level terms of Zenith's

---

[11] *Id.*, Ex. A ("Series A Agreement").

[12] *Id.* § 9.9(a).

[13] SAC ¶ 44.

[14] *See* Dkt. 312 ("MTD Opp'n"), Ex. 1 at 1.

[15] *Id.*, Ex. 2 at 1-2.

[16] *See* Dkt. 373 ("Supp. Reply Br."), Ex. H.

[17] *Id.*

[18] *Id.*

purchase of Series A shares" and "the latest drafts of the transaction documents," including the "Restated Charter."[19] Ultimately, Mayya sold 25,830 shares to Zenith and signed the Series A Agreement as a "Seller."[20]

In connection with the Investment, "certain significant minority stockholders of [Alphonso]" ("Key Holders"), Alphonso, and Zenith entered into a stockholders' agreement, dated December 23, 2020 ("SHA").[21] Mayya is not a Key Holder or a party to the SHA.[22] The SHA contains an arbitration clause materially identical to the Series A Arbitration Clause ("SHA Arbitration Clause").[23] In the SHA "the Key Holders secured certain rights intended to protect minority stockholders' interest in [Alphonso]."[24] Several of those rights are central to the parties' dispute.[25] First, the SHA allows the minority stockholders to "demand that Alphonso go public" beginning in 2024.[26] If no IPO occurs after such a demand, Alphonso must "conduct annual

---

[19] *Id.*

[20] *Id.*; Series A Agreement at Signature Pages.

[21] SAC ¶¶ 3, 38; *see* SAC, Ex. 1 ("SHA"). Several of the Key Holders "are founders and/or were executives of Alphonso until their termination on December 16, 2022." SAC ¶¶ 14-15. That group includes Ashsh Chordia, Lampros Kalampoukas, and Ravi Sarma, who served as plaintiffs in this action before Mayya intervened and substituted in as plaintiff. *See* Dkt. 344; Dkt. 345.

[22] *See* SHA, Ex. B (listing the Key Holders).

[23] *Id.* § 13.4(a) ("[A]ny controversy, claim or question of interpretation in dispute between any of the Parties . . . arising out of or relating to this Agreement, any document contemplated by this Agreement or the transactions contemplated herein (including as to arbitrability hereunder), shall be settled by final and binding arbitration in New York, New York under the then-effective rules of the International Chamber of Commerce ("ICC")[.]").

[24] SAC ¶¶ 3, 38.

[25] *See, e.g.*, SAC ¶¶ 135-56.

[26] *Id.* ¶ 39.

6

tender offers to purchase at least one third of the total minority-held shares and options in existence at the time of [the] [I]nvestment, at fair market value, in each of 2024, 2025, and 2026."[27] Second, the SHA allows the Key Holders to appoint three members of the Board, while LGE appoints the remaining four Board members.[28] Third, the SHA allows the Key Holders to veto certain governance decisions, as "the affirmative vote or consent of at least one [Key Holder appointed] Director is necessary to (i) approve any related-party transaction with Zenith or its affiliates; (ii) approve any postponements of the IPO beyond December 2025; (iii) modify or postpone the tender offer schedule; and (iv) determine fair market value for the tender offers."[29] Fourth, so long as some Key Holders are working at Alphonso, a majority of the employee Key Holders must consent to amend or terminate the SHA.[30]

In the two years following the Investment, Alphonso's business grew significantly.[31] On April 26, 2021, Alphonso and LGE entered into an agreement under which LGE sold ad inventory to Alphonso ("Inventory Agreement").[32] The parties determined the Inventory Agreement's pricing term via a "comprehensive transfer pricing study," which Mayya alleges LGE improperly influenced for its

---

[27] *Id.*; *see* SHA § 11.

[28] SAC ¶ 40; *see* SHA §§ 10.1, 10.2.

[29] SAC ¶ 41; *see* SHA § 10.5(d).

[30] SAC ¶ 42; *see* SHA §§ 13.1(b), 13.8.

[31] SAC ¶¶ 45-47.

[32] *Id.* ¶ 48; SAC, Ex. 2; Ex. 3.

7

benefit.[33] Unsatisfied with the results of the pricing study, LGE sought to renegotiate and raise the prices Alphonso paid for ad inventory based on "a host of shifting, pretextual rationales[.]"[34] Mayya insists LGE's true goal "was to stop moving money (profits) from LGE's shareholders to Alphonso and to instead shift value back to LGE" because "LG[E] had abandoned its prior commitment to an Alphonso IPO[.]"[35] The Key Holders working at Alphonso resisted any change to the Inventory Agreement's pricing.[36]

The pricing conflict prompted Defendants to explore ways they could "eliminate minority protections in the [SHA] and seize complete control of Alphonso."[37] Defendants developed a plan "which entailed firing the Key Holders [working at Alphonso], [] removing the [Key Holder appointed] Directors, and [] terminating the [SHA] altogether – with the goal of eliminating minority liquidity rights."[38] Defendants would then appoint new, loyal, Alphonso management to approve an LGE-favorable "pricing amendment to the Inventory Agreement."[39] That

---

[33] SAC ¶¶ 49-51. For example, Mayya alleges that "LG went so far as to pressure KPMG directly to revise its original transfer pricing analysis[.]" *Id.* ¶ 54.

[34] *Id.* ¶¶ 52-55.

[35] *Id.* ¶ 56.

[36] *Id.* ¶ 57. As alleged, this prompted LGE to breach the Inventory Agreement's exclusivity provision and enter into agreements to sell its ad inventory to third parties. *Id.* ¶¶ 58-59.

[37] *Id.* ¶¶ 60-65.

[38] *Id.* ¶¶ 66-71.

[39] *Id.* ¶ 66.

8

plan, nicknamed "Project Wall-E," necessitated hiring an LGE-loyal CEO, Adam Sexton, to fire Key Holders the Board lacked the authority to terminate.[40]

On December 16, 2022, Defendants executed Project Wall-E.[41] First, the LGE-affiliated directors caused the Board to fire most of the Key Holder Alphonso employees and name Sexton interim CEO.[42] Sexton then fired the remaining Key Holder employees.[43] LGE then "caused [] Zenith to execute a written consent . . . purporting to amend [Alphonso's] Bylaws" and remove the Key Holder appointed directors on the Board ("December Consent").[44]

Rather than terminate the SHA, "Defendants, on behalf of Zenith, sent each of the [t]erminated Key Holders an offer to buy their shares in Alphonso for $16.64 per share." [45] The Key Holders rejected that offer because of the "substantially undervalued price" and a desire to not "leave all other minority stockholders with illiquid stock that LG[E] could then attempt to purchase at an even cheaper price."[46] Although Defendants did not terminate the SHA, they "continued efforts to transfer value from Alphonso [] [] by amending the Inventory Agreement," refusing to take Alphonso public, and improperly conducting the scheduled tender offers.[47] This

---

[40] *Id.* ¶¶ 68, 71-72.

[41] *Id.* ¶ 73.

[42] *Id.* ¶¶ 73-74.

[43] *Id.* ¶¶ 74, 81. "Sexton himself was fired shortly after he was hired because of significant personal issues that interfered with his ability to perform the role of interim CEO." *Id.* ¶ 80.

[44] *Id.* ¶ 75; *see id.* ¶¶ 76-79 (alleging the reasons for that removal "were patently pretextual.").

[45] *Id.* ¶¶ 82-85.

[46] *Id.* ¶ 86.

[47] *Id.* ¶¶ 91-123.

action challenges those efforts as well as Defendants' actions concerning Project Wall-E and the Inventory Agreement.[48]

## B. Procedural History

A group of Key Holders, including those fired as part of Project Wall-E, initiated this action on March 30, 2023.[49] The initial complaint included (1) a claim under § 225 of the Delaware General Corporation Law ("DGCL") to determine the Board's composition and declare the December Consent invalid; and (2) a breach of fiduciary duty claim.[50] The Court granted the then-Plaintiffs' unopposed motion to expedite the § 225 claim,[51] and held a two-day trial on September 20-21, 2023.[52] On January 4, 2024, following briefing and argument, the Court issued a post-trial memorandum opinion declaring the December Consent's removal of the Key Holder designated directors invalid.[53] The then-Defendants unsuccessfully appealed the Court's ruling on the § 225 claim to the Delaware Supreme Court.[54]

Thereafter, a subset of the original Plaintiffs – Ashish Chordia, Lampros Kalampoukas, and Ravi Sarma – filed an amended complaint.[55] The amended complaint (1) removed all other prior-Plaintiffs; (2) added LGE, Yoo, Damon Park,

---

[48] *Id.* ¶¶ 135-65.

[49] *See* Dkt. 1 ("Compl.").

[50] *Id.* ¶¶ 82-96.

[51] *See* Dkt. 30; Dkt. 46.

[52] *See* Dkt. 178; Dkt. 179.

[53] *See* Dkt. 206.

[54] *See* Dkt. 267.

[55] *See* Dkt. 273.

and Yong Sung Park as Defendants; and (3) alleged a new breach of fiduciary duty claim against LGE and Zenith as well as an aiding and abetting claim against LGE and Jo.[56] Defendants moved to compel arbitration under the SHA Arbitration Clause ("MTC")[57] and LGE moved to dismiss for lack of personal jurisdiction ("MTD," together with the MTC, "Motions").[58] On March 10, 2026, the Court held oral argument on the Motions.[59] At oral argument, the Court indicated to Plaintiff's counsel that overcoming the MTC could be difficult.[60]

Eight days after oral argument, Chordia, Kalampoukas, and Sarma moved to withdraw as Plaintiffs.[61] On the same day, Mayya, represented by the same counsel, filed a motion to intervene as plaintiff pursuant to Court of Chancery Rule 24.[62] On March 26, the Court granted both motions.[63] Four days later, Mayya filed the operative second amended complaint.[64] Defendants renewed the Motions,[65] and the Court ordered supplemental briefing "on how [] Mayya's [] substitution affects the

---

[56] *See id.*

[57] *See* MTC Opening Br.

[58] *See* Dkt. 277.

[59] *See* Dkt. 341 ("OA Tr.").

[60] *See id.* at 54-67, 72-87. *See also* Dkt. 342 ¶ 2 ("After the hearing . . . Plaintiffs . . . acknowledg[ed] the likelihood that Defendants may succeed on their Motion to Compel Arbitration.").

[61] *See* Dkt. 338.

[62] *See* Dkt. 340.

[63] *See* Dkt. 344; Dkt. 345.

[64] *See* SAC.

[65] *See* Dkt. 353; Dkt. 354.

parties' prior arguments[.]"[66] After the parties completed supplemental briefing, the Court took the matter under advisement.[67]

## II. STANDARD OF DECISION

A motion to dismiss "in favor of arbitration challenges the forum in which the suit was filed, and the proper motion for disputing forum invokes rule 12(b)(3)[.]"[68] On a Rule 12(b)(3) motion, the court can "consider extrinsic evidence from the outset."[69] When evaluating such a motion, "the well-settled rule is that the court should give effect to the terms of private agreements to resolve disputes in the chosen forum out of respect for the parties' contractual designation."[70] Thus, consistent with Delaware's contractarian nature[71] and public policy in favor of arbitration,[72] "court[s] can–and generally will–enforce [an] arbitration agreement."[73] That being said, although "contractual arbitration clauses are generally interpreted broadly,"[74] a

---

[66] Dkt. 358.

[67] *See* Dkt. 366 ("Supp. Opp'n Br."); Dkt. 373 ("Supp. Reply Br.").

[68] *E.g.*, *Ghandi-Kapoor v. Hone Capital LLC*, 307 A.3d 328, 343 (Del. Ch. 2023).

[69] *Centene Corp. v. Accellion, Inc.*, 2022 WL 898206, at *5 (Del. Ch. Mar. 28, 2022).

[70] *Masimo Corp. v. Kiani*, 2026 WL 1080396, at *5 (Del. Ch. Apr. 21, 2026) (internal quotation marks omitted).

[71] *See, e.g.*, *Thompson St. Cap. Partners IV, L.P. v. Sonova U. S. Hearing Instruments, LLC*, 340 A.3d 1151, 1165-66 (Del. 2025) ("Delaware is a contractarian state that holds parties' freedom of contract in high regard." (citations omitted)).

[72] *See James & Jackson, LLC v. Willie Gary, LLC*, 906 A.2d 76, 78 (Del. 2006) (citation omitted).

[73] *Ghandi-Kapoor*, 307 A.3d at 334.

[74] *NAMA Hldgs., LLC v. Related World Mkt. Ctr., LLC,* 922 A.2d 417, 430 (Del. Ch. 2007).

12

party "cannot be required to submit to arbitration any dispute which [it] has not agreed [] to submit."[75]

Court of Chancery Rule 12(b)(2) governs motions to dismiss for lack of personal jurisdiction.[76] The plaintiff "bears the burden of showing a basis for a trial court's exercise of jurisdiction over a nonresident defendant."[77] If the court has not held an evidentiary hearing, "the plaintiff's burden is a relatively light one."[78] In that circumstance, "[t]he plaintiff must only make a *prima facie* showing that the exercise of personal jurisdiction is appropriate and the record is construed in the light most favorable to the plaintiff."[79] In ruling on a Rule 12(b)(2) motion, "the court may consider the pleadings, affidavits, and any discovery of record."[80]

## III. ANALYSIS

The Court first addresses Defendants' motion to compel arbitration, before addressing LGE's motion to dismiss for lack of personal jurisdiction.

### A. Mayya's Claims are Not Subject to Arbitration

Defendants' MTC contends that Mayya's claims are subject to arbitration for three independent reasons.[81] First, Defendants argue that the Series A Arbitration

---

[75] *Willie Gary, LLC*, 906 A.2d at 78.

[76] Ct. Ch. R. 12(b)(2).

[77] *AeroGlobal Capital Management, LLC v. Cirrus Industries, Inc.*, 871 A.2d 428, 437 (Del. 2005).

[78] *Sciannella v. AstraZeneca UK Limited*, 2024 WL 3327765, at *13 (July 8, 2024), *aff'd*, 340 A.3d 544 (Del. 2025) (TABLE)

[79] *Id.* (internal quotation marks omitted).

[80] *Id.*

[81] *See* Supp. Opening Br. at 9-21.

13

Clause requires arbitrating Mayya's claims.[82]  Second, Defendants assert that the SHA Arbitration Clause mandates arbitration – despite the fact that Mayya is not a party to the SHA – because he is suing derivatively on behalf of Alphonso, a signatory.[83]  Third, Defendants argue that Mayya is equitably estopped from disavowing the SHA Arbitration Clause.[84]  Defendants also insist that the parties "delegate[d] questions of arbitrability to the arbitrator."[85]  Mayya rejects Defendants' three arguments in favor of arbitration and maintains that "this Court must decide the question of arbitrability."[86]

When evaluating a motion to compel arbitration, the ultimate question is whether the parties assigned the at-issue dispute to arbitration (*i.e.*, the arbitrability question).[87]  Determining arbitrability requires answering a threshold question – "who [] decide[s] whether the parties [] agreed to submit the [] issue to arbitration."[88]  To answer that question, the Court "asks whether the parties have agreed to have an arbitrator decide the arbitrability question."[89]  Delaware courts refer to that threshold inquiry as the "delegation question."[90]

---

[82] *See id.* at 9-13.

[83] *See id.* at 13-17.

[84] *See id.* at 17-21.

[85] *Id.* at 10-11 ("That agreement to delegate arbitrability is dispositive.").

[86] *See* Supp. Opp'n Br. at 4-21.

[87] *See Fairstead Cap. Mgmt. LLC v. Blodgett*, 288 A.3d 729, 749-51 (Del. Ch. 2023).

[88] *Id.* at 751-56 (internal quotation marks omitted).

[89] *Id.* at 748 (citations omitted).

[90] *E.g., id.* at 748-49, 756-58.

The United States Supreme Court's decision in *Henry Schein, Inc. v. Archer & White Sales, Inc.* clarified how courts must address the delegation question.[91]  The High Court reiterated that "parties [can] agree by contract that an arbitrator, rather than a court, will resolve threshold arbitrability questions as well as underlying merits disputes."[92]  Such contracts constitute "'an additional, antecedent agreement the party seeking arbitration asks the [] court to enforce[.]'"[93]  Relying on the Federal Arbitration Act's requirement that courts "interpret contracts as written," the Court held that "[w]hen the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract."[94]  Accordingly, "[i]n those circumstances, a court possesses no power to decide the arbitrability issue.  That is true even if the court thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless."[95]

Delaware law recognizes that "[b]ecause arbitration is a matter of contract, 'a party cannot be required to submit to arbitration any dispute which he has not agreed

---

[91] 586 U.S. 63 (2019).

[92] *Id.* at 65.

[93] *Id.* at 68 (quoting *Rent–A–Center, West, Inc. v. Jackson,* 561 U.S. 63, 70 (2010) (edits added)).

[94] *Id.* at 68.

[95] *Id.* at 68.  In so holding, the Court rejected "the 'wholly groundless' exception" under which some courts "determined that the court rather than an arbitrator should decide the threshold arbitrability question if, under the contract, the argument for arbitration is wholly groundless." *Id.*  Citing this Court's pre-*Schein* decision in *Feeley v. NHAOCG, LLC*, Mayya argues that "the lack of any connection between [his] fiduciary duty claims and the Series A Agreement precludes delegating the question of arbitrability" because, in Mayya's view, the argument for arbitrability is frivolous. Supp. MTC. Opp'n at 20 (citing 62 A.3d 649, 656 (Del. Ch. 2012)).  That argument is no longer available after *Schein*. *See Blodgett*, 288 A.3d at 758 ("Even if the court were to view the arguments for arbitrability as wholly frivolous, they would still be for the arbitrator to decide.").

so to submit.'"[96]  Post-*Schein*, this Court has repeatedly held "that a court must enforce a delegation agreement even if [the] court thought the argument for arbitrability was wholly groundless."[97]  As Vice Chancellor Zurn explained in *In re Neworld Energy Holdings, LLC*, "under the familiar *Willie Gary* test, if the relevant agreement presents clear and unmistakable evidence that the parties intended to delegate issues of substantive arbitrability to an arbitrator, 'a court possesses no power to decide the arbitrability issue.'"[98]

Thus, the Court will enforce agreements to empower an arbitrator to decide arbitrability.  Yet, under this paradigm the Court "must address issues of contract formation before deferring to an arbitrator[.]"[99]  It is axiomatic that contracts must "comply with the law, and Delaware law does not permit a court to enforce a contract prohibited by law."[100]  Thus, there can be no agreement to arbitrate fiduciary duty claims where the contracting corporation lacked authority to agree in advance to

---

[96] *Blodgett*, 288 A.3d at 749 (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 123 (2002)).

[97] *E.g.*, *id.* at 753.

[98] *In re Neworld Energy Hldgs., LLC*, 2023 WL 5529689, at *1 (Del. Ch. Aug. 24, 2023) (quoting *Schein*, 586 U.S. at 78-79).

[99] *BuzzFeed Media Enterprise, Inc. v. Anderson*, 2024 WL 2187054, at *13 (Del. Ch. May 15, 2024) (internal quotation marks omitted) ("The first issue before a court in an action to compel arbitration is whether an agreement to arbitrate exists."); *see Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 296 (2010) ("It is . . . well settled that where the dispute at issue concerns contract formation, the dispute is generally for courts to decide.")

[100] *AB Stable VIII LLC v. Maps Hotels and Resorts One LLC*, 2020 WL 7024929, at *80 (Del. Ch. Nov. 30, 2020).

arbitration as the exclusive forum for resolving fiduciary duty claims.[101] Here, Defendants seek to compel arbitration of Mayya's fiduciary duty claims. Thus, the Court must first consider whether Alphonso had the power to agree in advance to an arbitration clause that covers Mayya's fiduciary duty claims in the Series A Agreement or SHA.

This Court recently discussed a corporation's ability to route fiduciary duty claims outside of Delaware.[102] The Court recognized that before our General Assembly enacted DGCL § 122(18), Delaware law "st[oo]d for the proposition that [corporate] fiduciary duty claims are status-based and arise independent of a contract, [so] a contractual forum selection clause cannot route them outside Delaware."[103] The pre-122(18) regime was rooted in the Delaware Supreme Court's *Parfi Holding AB v. Mirror Image Internet, Inc.* ruling,[104] as discussed in this Court's *Harris v. Harris* decision.[105] Under that regime, "'[i]f corporations wish[ed] to route internal affairs claims to a particular forum, then they c[ould] adopt charter or bylaw provisions designed to achieve that result. A provision in a contract [would] not do the trick.'"[106] "Section 122(18) takes a different approach" by "authoriz[ing] stockholder agreements that route internal affairs claims related thereto exclusively

---

[101] *See Moelis & Company v. West Palm Beach Firefighters' Pension Fund*, -- A.3d --, 2026 WL 184868, at *6-7 (Del. 2026) (defining "*ultra vires*" acts as those "beyond the corporation's power to take.").

[102] *Masimo Corporation v. Kiani*, 2026 WL 1080396 (Del. Ch. Apr. 21, 2026).

[103] *Masimo*, 2026 WL 1080396, at *7.

[104] 817 A.2d 149 (Del. 2002).

[105] 2023 WL 193078, at *24 (Del. Ch. Jan. 16, 2023)

[106] *Masimo*, 2026 WL 1080396, at *8 (quoting *Harris*, 2023 WL 193078, at *24 (edits added)).

17

to a non-Delaware forum."[107] Thus, a corporation can agree in advance to resolve fiduciary duty claims via arbitration, so long as it does so via an agreement covered by § 122(18).[108]

Accordingly, if § 122(18) applies, there is no question that Alphonso could enter into a stockholder agreement that sends its internal affairs claims to arbitration. Yet, the Senate Bill that enacted § 122(18):

> bec[a]me effective on August 1, 2024, and . . . appl[ies] to all contracts made by a corporation, [and] all agreements, instruments or documents approved by the board of directors . . . in each case whether or not the contracts, agreements, instruments, [or] documents . . . are made, approved or entered into on or before such date, *except that . . . this Act shall not apply to or affect any civil action or proceeding completed or pending on or before such date.*[109]

This action began on March 30, 2023, over a year before § 122(18) became effective.[110]

Thus, § 122(18) and *Masimo* do not apply. Instead, the pre-122(18) standard controls.

---

[107] *Id.* at *9.

[108] *See Nat'l Indus. Grp. (Holding) v. Carlyle Inv. Mgmt. L.L.C.*, 67 A.3d 373, 384 n.41 (Del. 2013) ("[A]n arbitration clause 'is, in effect, a specialized kind of forum-selection clause.'" (quoting *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 519 (1974))). Indeed, Defendants acknowledge this in their briefing. *See* Supp. Opp'n Br. at 10 (although disputing whether non-signatories are bound, acknowledging that "Section 122(18) allows Alphonso to agree in a stockholders' agreement with certain stockholders that any derivative claims must be arbitrated (as an exception to Section 115's general prohibition against doing so)").

[109] Del. S.B. 313, § 6 152d Gen. Assem. (2024) (emphasis added).

[110] The Court recognizes that since this action commenced the complaint has been amended and the parties have changed significantly, including the recent withdrawal of the prior plaintiffs and substitution of an entirely new plaintiff, Mayya. Yet, the bill enacting § 122(18) speaks in terms of civil actions pending, not the specific parties thereto or the claims or allegations therein. Generally, the substitution of a new plaintiff where "the causes of action are the same as those in the original complaint," does not change the filing date. *McCarthy v. Fifer*, 2018 WL 5840520, at *2-3 (Del. Super. Nov. 7, 2018); *see Choice Hotels Intern., Inc. v. Columbus-Hunt Park DR. BNK Investors, L.L.C.*, 2009 WL 3335332, at *6 (Del. Ch. Oct. 15, 2009). Here, there is no dispute that Mayya's core allegations and fiduciary duty claims have been present in this litigation from the outset. *Compare* Compl. ¶¶ 87-96, *with* SAC ¶¶

18

As discussed, under that standard a corporation lacks the power to route internal affairs claims to a particular forum via a forum selection clause in a contract.

Accordingly, Alphonso could not agree in advance to arbitrate Mayya's fiduciary duty claims in the Series A Agreement. To be clear, that conclusion does not arise from a finding that Defendants' arguments for arbitration are wholly groundless or frivolous. Indeed, the Court need not consider the Series A Arbitration Clause's text to reach its result. Instead, the Court concludes that there is no valid agreement to arbitrate Mayya's claims because, under this case's unique facts, Alphonso lacked authority to route Mayya's fiduciary duty claims outside of Delaware in a contract like the Series A Agreement. Where a corporation is powerless to agree in advance to assign certain claims to arbitration, it necessarily follows that there can be no advance agreement to arbitrate those claims.[111] Restated, it does not matter how broadly or narrowly the parties drafted the Series A Arbitration Clause; it cannot capture Mayya's claims as a matter of law. Accordingly, the Court must decide the arbitrability dispute even though the Series A Arbitration Clause otherwise empowers the arbitrator to resolve such disputes.

Given the above analysis, resolving the parties' arbitrability dispute is straightforward. Under the pre-122(18) regime that applies here, corporations like Alphonso could only agree in advance to resolve fiduciary duty claims in a particular

---

139-65. Thus, what controls is this action's filing date, not when Mayya substituted as Plaintiff.

[111] *See Gandhi-Kapoor*, 307 A.3d at 335 ("[W]ithout an agreement to arbitrate, the arbitrator has no power.").

19

forum via a § 115-compliant charter or bylaw provision; "[a] provision in a contract does not do the trick.[112] Accordingly, despite their otherwise broad language, the SHA Arbitration Clause and Series A Arbitration Clause cannot capture Mayya's fiduciary duty claims as a matter of law.[113] Instead, the Charter Forum Selection Clause controls and requires that this Court resolve Mayya's claims.[114] Defendants' motion to compel arbitration is denied.

## B. Mayya Made a *Prima Facie* Showing that LGE Implicitly Consented to This Court's Personal Jurisdiction

Independent of the MTC, LGE moved to dismiss Mayya's claims against it for lack of personal jurisdiction. Courts "apply a two-prong test in evaluating whether a plaintiff has met its burden to establish personal jurisdiction over a non-resident defendant."[115] First, the Court determines "whether Delaware's long arm statute, 10 *Del. C.* § 3104(c), is applicable."[116] Second, the Court decides "whether subjecting the nonresident defendant to jurisdiction would violate due process."[117]

---

[112] *Harris*, 2023 WL 193078, at *24; *see Masimo*, 2026 WL 1080396 at *8 (citing *Parfi*, 817 A.2d at 155-60).

[113] Because the Court concludes that the SHA Arbitration Clause cannot cover Mayya's fiduciary duty claims, it need not resolve the parties' arguments concerning whether Mayya is bound by the SHA Arbitration Clause.

[114] *See* Alphonso Charter Art. XII ("[T]he Court of Chancery in the State of Delaware shall be the sole and exclusive forum for any stockholder . . . to bring (i) any derivative action . . . on behalf of [Alphonso], (ii) any action asserting a claim of breach of fiduciary duty owed by any director [or] officer . . . to [Alphonso] or [Alphonso's] stockholders, . . . or (iv) any action asserting a claim against [Alphonso], its directors [or] officers [] [] governed by the internal affairs doctrine[.]").

[115] *Sciannella*, 2024 WL 3327765, at *13.

[116] *Matthew v. Fläkt Woods Group SA*, 56 A.3d 1023, 1027 (Del. 2012).

[117] *Id.*

20

Mayya argues that LGE is subject to the Court's personal jurisdiction for three independent reasons.[118] First, Mayya argues "LGE implicitly consented to personal jurisdiction . . . when it caused Alphonso to adopt and maintain the [Charter] Forum Selection Clause[.]"[119] Second, Mayya invokes "the conspiracy theory of jurisdiction."[120] Finally, Mayya contends that "LGE is also subject to personal jurisdiction under the agency theory of jurisdiction."[121] Because the Court concludes that Mayya made a *prima facie* showing that LGE implicitly consented to this Court's personal jurisdiction, this decision does not address his alternative arguments.

It is well-established that "[p]arties may consent to personal jurisdiction in Delaware by contract[.]"[122] Where such consent exists, "a minimum contacts analysis is not required" for the Court to exercise personal jurisdiction.[123] "Consent to personal jurisdiction is often express, but it can also be implied."[124] When "a party agrees to litigate in a forum, the party is considered to have implicitly consented to personal jurisdiction in that forum."[125] In certain circumstances, a controller

---

[118] *See* MTD Opp'n at 9-23.

[119] *Id.* at 9-15.

[120] *Id.* at 15-21.

[121] *Id.* at 21-23.

[122] *Sciannella*, 2024 WL 3327765, at *13

[123] *Capital Group Companies, Inc. v. Armour*, 2004 WL 2521295, at *2 (Del. Ch. Oct. 29, 2004); *see Nat'l Indus. Gp. (Hldg.) v. Carlyle Inv. Mgmt. L.L.C.*, 67 A.3d 373, 381 (Del. 2013).

[124] *In re Pilgrim's Pride Corporation Derivative Litigation*, 2019 WL 1224556, at *11 (Del. Ch. Mar. 15, 2019).

[125] *In re Carvana Co. Stockholders Litigation*, 2022 WL 3923826, at *2 (Del. Ch. Aug. 31, 2022); *see Pilgrim's Pride*, 2019 WL 1224556, at *12 ("Delaware courts have applied principles of implied consent to hold that when parties specify an exclusive forum for disputes, they implicitly agree to the existence of personal jurisdiction in that forum." (citations

"implicitly consent[s] to personal jurisdiction in Delaware by causing [a] [subsidiary] to adopt" a Delaware forum selection provision in its governing documents.[126] Precedent identifies "two categories" of facts that "evidence [a controller's] implicit consent."[127]

The first category considers whether "the intent of the forum selection provision was to funnel claims for breach of fiduciary duty against the controller into the Delaware courts."[128] Facts that evidence that intent include (1) if the forum selection clause "cover[s] actions for breach of fiduciary duty owed by any stockholder of the corporation";[129] and (2) the time and circumstances surrounding the forum selection provision's adoption or maintenance.[130] For example, where a board of directors approves a forum selection clause contemporaneously with a transaction, "[i]t is reasonable to infer that the [b]oard . . . intend[ed] that it would apply to any Delaware law claims that a stockholder plaintiff might bring challenging the

---

omitted)). That is true, despite "the obvious points that personal jurisdiction and forum-selection are different things and that a bylaw can address one but not the other." *Pilgrim's Pride*, 2019 WL 1224556, at *14.

[126] *Sciannella*, 2024 WL 3327765, at *14; *see Pilgrim's Pride*, 2019 WL 1224556, at *1, 13-14; *Carvana*, 2022 WL 3923826, at *5-6.

[127] *Carvana*, 2022 WL 3923826, at *4 (citing *Pilgrim's Pride*, 2019 WL 1224556, at *13-14).

[128] *Id.*

[129] *Id.* ("Only controlling stockholders owe fiduciary obligations under Delaware law."); *see Pilgrim's Pride*, 2019 WL 1224556, at *13.

[130] *See Pilgrim's Pride*, 2019 WL 1224556, at *13; *Carvana*, 2022 WL 3923826, at *4.

22

[transaction]."[131]  That is true even if the controller did not foresee the specific circumstances "that would give rise to the claims against him."[132]

The second category considers the controller's "influence over the process by which the [forum selection] provision was adopted" or maintained.[133]  "Because the court's authority to exercise personal jurisdiction based on a forum selection clause is based on the defendant's consent, this second category of factors [is] critical to the court's analysis."[134]  That the controller "was not involved directly in [the] adoption" is not dispositive.[135]  Instead, it is sufficient that "a majority of the board was beholden to [the controller]," which "possess[es] hard, mathematical control" via its voting power.[136]

Taken together, these considerations demonstrate Mayya carried his burden of making a *prima facie* showing that LGE implicitly consented to this Court's personal jurisdiction via the Charter Forum Selection Clause.  There is no dispute that "LGE negotiated [the Charter Amendment] in tandem with the [SHA]."[137]  LGE and Alphonso's pre-Investment communications show (1) LGE proposed and drafted the Charter Amendment; and (2) adopting the Charter Amendment was a condition

---

[131] *Pilgrim's Pride*, 2019 WL 1224556, at *13.

[132] *Carvana*, 2022 WL 3923826, at *5.

[133] *Id.* at *4.

[134] *Id.* ("[I]f [the controller] lacked any ability to direct or reverse the result of the board's process, then [the controller] could not be said to have implicitly consented to that result.").

[135] *Id.* (citing *Pilgrim's Pride*, 2019 WL 1224556, at *13).

[136] *Id.* at *4, *6; *see Pilgrim's Pride*, 2019 WL 1224556, at *13-14.

[137] Dkt. 324 ("MTD Reply") at 15; *see* MTD Opp'n at 4.

23

for LGE's Investment.[138]  After the Investment, Zenith, LGE's wholly owned, indirect subsidiary, owned 59.5% of Alphonso's stock, making it the "controlling stockholder."[139]  As alleged, "Zenith acts as LGE's agent with respect to all matters relating to Alphonso."[140]  The SHA also entitles Zenith to appoint a majority of Alphonso's Board.[141]  "At all relevant times since [the] [I]nvestment," Zenith's appointed directors "are, or were at the time of their service on the Board (i) employees of LGE or LG US, and (ii) controlled by LGE."[142]  LGE does not dispute that it "could have acted to remove or modify the [Charter] Forum Selection Clause . . . if it did not want actions of this type to be brought in Delaware."[143]  That LGE did not suggests LGE implicitly consented to its terms.  Accordingly, viewing the record in the light most favorable to Plaintiff, the Court concludes that Mayya has made a *prima facie* showing that LGE implicitly consented to the Court's personal jurisdiction.

It is true, as LGE argues, that this case is factually distinct in certain ways from prior cases that found implicit consent to jurisdiction.[144]  For one, the Charter

---

[138] MTD Opp'n, Ex. 1 at 1; Ex. 2 at 1-2.

[139] SAC ¶ 16.

[140] *Id.* ¶ 17.

[141] SAC ¶ 40; *see* SHA §§ 10.1, 10.2.

[142] SAC ¶ 17; *see id.* ¶¶ 18-25.

[143] MTD Opp'n at 13-14 (citing *Carvana*, 2022 WL 3923826, at *4-5; *Pilgrim's Pride*, 2019 WL 1224556, at *13); *see* MTD Reply at 3-7 (not disputing LGE could have caused Alphonso to amend its charter to remove the Charter Forum Selection Clause).

[144] *See* Dkt. 278 ("MTD Opening") at 14-16; MTD Reply at 3-7.  LGE attempts to differentiate the cases Mayya cites in support of its implicit consent argument. *See* MTD Reply at 5-7. Those efforts fall flat.  That the *Pilgrim's Pride* decision "is limited to the facts of th[e] case"

Forum Selection Clause does not explicitly cover fiduciary duty claims asserted against Alphonso's stockholders.[145]  Yet, that fact does not preclude finding that LGE implicitly consented to the Court's personal jurisdiction.[146]  It is also true that LGE did not cause Alphonso to adopt the Charter Forum Selection Clause in the first instance.  As discussed, however, Alphonso had the ability to, and did, require an amendment to Alphonso's charter, such that it could logically also have required removal of the Charter Amendment if it so demanded.  Accordingly, it is not clear that causing Alphonso to maintain the Charter Forum Selection Clause is meaningfully distinct from causing its adoption in the first instance.[147]

---

is unpersuasive given that this Court has subsequently applied its reasoning to conclude that a party implicitly consented to personal jurisdiction in Delaware. *Pilgrim's Pride*, 2019 WL 1224556, at *15; *see, e.g.*, *Kormos v. Playtika Hldg. UK II Ltd.*, C.A. No. 2023-0396-SG (Del. Ch. Jan. 18, 2024) (TRANSCRIPT); *Carvana*, 2022 WL 3923826, at *6 ("The limiting language of *Pilgrim's Pride* does not affect the outcome of this decision.").  LGE's attempts to differentiate *Carvana* fail for similar reasons.  LGE asserts the fact "that that this Court looked to other corporate agreements . . . strongly supports the argument that the Court should look to the Stockholders' Agreement here." MTD Reply at 7 ("the controller caused the company to not only re-adopt a Delaware forum-selection clause in its charter, but also in a new concurrently executed LLC Agreement.").  Perhaps, but for the reasons discussed, looking to the SHA does not change the outcome.

[145] Alphonso Charter Art. XII.

[146] For example, in *Sciannella v. AstraZeneca UK Limited* the Court held there was a *prima facie* case that a controller implicitly consented to jurisdiction via a forum provision that captured the same claims as the Charter Forum Selection Clause. 2024 WL 3327765, at *6 ("[T]he [forum provision] designates this court as the 'sole and exclusive forum' for 'any action or proceeding asserting a claim of breach of fiduciary duty owed by any current or former director, officer, or other employee of the Corporation, to the Corporation or the Corporation's stockholders.'"); *see* Alphonso Charter Art. XI ("[T]he Court of Chancery in the State of Delaware shall be the sole and exclusive forum for any stockholder (including a beneficial owner) to bring . . . any action asserting a claim of breach of fiduciary duty owed by any director, officer or other employee of the Corporation to the Corporation or the Corporation's stockholders.").

[147] Indeed, this Court has previously held that some amount of factual distinction from prior cases does not preclude holding that a controller implicitly consented to personal jurisdiction

25

Last, LGE points to the SHA Arbitration Clause and Series A Arbitration Clause as, themselves, evidence against implicit consent to personal jurisdiction. LGE explains that "if Alphonso consents to a non-Delaware forum in writing, the Charter[] [F]orum [S]election [C]lause does not apply."[148] Yet, for the reasons already discussed, the arbitration clauses do not—indeed, cannot—capture Mayya's claims as a matter of law. At all relevant times through when this action commenced, Delaware law prohibited corporations from routing internal affairs claims to a particular forum in contracts like the SHA or Series A Agreement.[149] Instead, corporations could "adopt a charter or bylaw provision" under DGCL § 115 to "route internal affairs claims to a particular forum."[150] Indeed, case law suggests that in the implicit consent context "[i]t is fair to infer the [the controller] knew of the purpose of [charter] forum selection provisions" when the controller caused the at-issue corporation to adopt or maintain them.[151] Therefore, although the SHA Arbitration Clause and

---

in Delaware. *See Carvana*, 2022 WL 3923826, at *5 ("It is true . . . that *Pilgrim's Pride* is distinguishable," but "[t]his distinction is inconsequential."); *Sciannella*, 2024 WL 3327765, at *14-15 (similar).

[148] MTD Opening at 14-15 (citing Alphonso's Charter Art. XII ("Unless the Corporation consents in writing to the selection of an alternative forum . . . .")).

[149] *See Harris*, 2023 WL 193078, at *24.

[150] *Id.* (citing 8 *Del. C.* § 115; *Salzberg v. Sciabacucchi*, 227 A.3d 102, 114 (Del. 2020)).

[151] *Carvana*, 2022 WL 3923826, at *5. That conclusion is rooted in "the purpose of forum selection provisions in corporate charters and bylaws." *Id.* Those provisions are "[e]xpressly permitted by Section 115 of the [DGCL] . . . [and] intended to corral internal affairs cases so they can be heard in the Delaware courts." *Id.* This Court has repeatedly discussed "the benefits of 'channeling internal affairs cases into the courts of the state of incorporation,' [] includ[ing] 'bringing order to what the boards of defendant corporations say they perceive to be [the] chaotic filing of duplicative and inefficient derivative and corporate suits against . . . directors and . . . corporations.'" *Id.* (quoting *Boilermakers Local 154 Retirement Fund v. Chevron Corp.*, 73 A.3d 934, 952 (Del. Ch. 2013) (alternations accepted)). *See also Salzberg*, 227 A.3d at 117 (holding that DGCL § 115 was "intended, in part, to codify *Boilermakers*.")).

26

Series A Arbitration Clause may attenuate Mayya's argument that LGE in fact implicitly consented to personal jurisdiction, they do not compel granting the MTD at this time. Instead, "construing the record in the light most favorable to [Mayya,]" the Court concludes he "satisfied his minimum burden" to make "a *prima facie* showing that [LGE] implicitly consented to personal jurisdiction in Delaware[.]"[152] LGE's motion to dismiss for lack of personal jurisdiction is denied.

## IV. CONCLUSION

For the foregoing reasons, the Court denies Defendants' motion to compel arbitration and LGE's motion to dismiss.

---

[152] *Sciannella*, 2024 WL 3327765, at *14-15.